OTTO RONNA, Administrator, Appellee, v. AMERICAN STATE BANK OF WALNUT et al., Appellants.

No. 40217.

APRIL 10, 1931.

REHEARING DENIED DECEMBER 18, 1931.

856

Addison G. Kistle and George S. Wright, for appellants.

Herminghausen & Herminghausen and Turner & Turner, for appellees.

█ DE GRAFF, J.—Plaintiff, Otto Ronna, was president of defendant American State Bank. Decedent, George Bohnk, on February 20, 1922, gave his note to the American State Bank for $3061.83 secured by chattel mortgage. He had a $10,000 life insurance policy in the Bankers Life, which he assigned to the bank as further collateral to this loan. On September 24, 1922, George Bohnk died, unmarried, without children. His mother was dead. His father, Hans F. Bohnk, who had been an inmate of the penitentiary since July 17, 1917, and at the time of the trial was still, was the only heir. The controversy ranges around the money collected on the insurance policy, $10,000, received by the American State Bank. Plaintiff, Otto Ronna, was appointed administrator of the estate. Plaintiff filed inventory but made no mention in it of the life insurance or of any money received on it. Plaintiff was not a witness at the trial. It would seem that he had absconded and that the suit is being conducted in behalf of others. By whom is not disclosed. The uncontradicted evidence in the record without objection is that Mr. Kistle (in what capacity does not appear) "asked him (Ronna) if he as administrator had always figured that he collected on the policy that belonged or applied to George Bohnk's life was a part of the funds of the estate, or whether it belonged to and would go directly to Hans Bohnk. He said that he had always understood that it belonged to Hans Bohnk and should go to him subject only to any claim the American State Bank had on ac-

count of its collateral assignment of the policy;'' that ''prior to the close of the American State Bank and while Otto Ronna was in the American State Bank I (Nichols, who had been assistant cashier in the American State Bank and later in the Walnut State Bank) had a conversation with him with reference to this Bohnk insurance sometime between the date the insurance money was received by Mr. Ronna and the date the sale of the personal property was held, sometime between October 9th and December 20th. Mr. Ronna said his attorneys had advised him this money went direct to Hans Bohnk irrespective of any debts or claims of the estate, except only for the collateral assignment the bank held to secure George's debt. He said the bank would have to keep the insurance money until they determined how much they would get out of the sale of the personal property that they could apply on the note, and then after the sale was held and that was determined and the balance taken out of the insurance money, they would have to pay it to Hans. When the Walnut State Bank entered into the contract with the American State Bank, and after Exhibit G had been made up and a part of that contract the Walnut State Bank understood and believed that this money which was shown by this sundry account, $10,000 insurance money, was the property of Hans Bohnk subject only to the collateral assignment.''

Hans F. Bohnk testifies:

''I claim rights in that (contract). My full rights. I don't know anything about it. That's the way I am standing. I am here and they were there. I didn't have any advice. I didn't have anybody to advise me.''

At the time of the death of George Bohnk the policy and the assignment were in the hands of the American State Bank. On October 9, 1922, the insurance company made a check payable '' to the order of Otto Ronna, Admr., and American State Bank $10,000 * * *'' This check was endorsed ''Otto Ronna, Administrator,'' and ''American State Bank by Otto Ronna, President.'' The Iowa National Bank was one of the correspondents of the American State Bank. The American State Bank remitted the $10,000 check to the Iowa National Bank, which gave credit for it to the American State Bank on checking account. The American State Bank kept what it called a ''sun-

dry account'' or book. In this sundry book was entered ''1922 H. F. Bohnk No. 5365— 10/10— Otto Ronna Ins. ............. $10,000 from Bankers Life Co.'' This book was simply one used for miscellaneous matters in which were entered various sundries that were not run through the ordinary permanent accounts.

In the fall of 1922 the property on which the American State Bank held the chattel mortgage was sold. The proceeds were insufficient to pay George Bohnk's debt to the American State Bank. The deficiency had to be made up from the proceeds of the insurance. The amount of the collection on account of insurance on balancing was $8927.08. It does not appear that either the administrator or Hans Bohnk made any allocation of this balance or gave any instructions in regard to it. Hans claims to have found out about the insurance in an indirect way. There is no showing of any authority on the part of the plaintiff to deposit any of the money in the bank. No agreement for putting it on deposit is shown.

The American State Bank was in a critical condition. It had great difficulty in obtaining from day to day enough money to take care of its current business. It was losing deposits. All of its acceptable bills receivable were pledged to the Iowa National, the Council Bluffs Savings and the War Finance Board, to all of which the American State was indebted for borrowed money and on re-discounts in large amounts. The American State Bank struggled along until May 23, 1922, when it closed its doors. Between the date of the credit of the $10,000 by the Iowa National to the American State Bank the account of the American State with it had been many times overdrawn. As has been seen, however, the National held collateral security for the indebtedness of the American State Bank to it.

After the closing of the American State Bank negotiations were had extending over a number of months looking to the organization of a new bank to take over the business of the American State Bank. During these negotiations there was considerable correspondence between the promoters of the new organization, the officers of the American State on the one hand and Hans F. Bohnk on the other with the purpose of getting Hans to join in the scheme for re-organization by making the necessary waiver of his deposit. Hans had on his own account

funds on deposit in the American State Bank and the correspondence, so far as specific deposits were referred to at all and the preliminary negotiations, seems to have had reference almost entirely, if not altogether, to Hans's individual deposits. Hans's confinement in the penitentiary made it difficult to negotiate either by letter or personally and the attention of those concerned seems to have been confined largely to the deposit accounts proper. The insurance and the entry on the sundries account were largely if not altogether for the time overlooked. The first proposition for re-organization was on the basis of a waiver of 35 per cent of the deposits other than the deposits of public money. Hans agreed to such a waiver. It was found that the new bank could not pay 65 per cent of the deposits of the American State Bank so the next proposition was for depositors to waive 55 per cent and the new bank pay 45 per cent of the deposits. Hans in a letter had said that he was ''not here to do anything in the way of keeping the bank from re-organizing. I am willing to do anything I can in my power for the best of myself and all the rest.'' Naturally he felt that he was somewhat in the dark and asked questions but the insurance appears for the time not to have been mentioned. Hans did, however, sign on June 26, 1923, one of the waiver forms that were being circulated and signed by the various depositors severally. Opposite Hans's signature to this waiver as it appears in evidence is this notation:

> ''CD $1,200.00
> ''Ins. $10,000.00 subject
> to assignment of American
> State Bank.''

Hans admits signing the waiver but testifies that the notation just quoted was not on the waiver at the time he signed. Mr. Turner, one of the attorneys who saw the waiver afterwards, testifies that the notation was not on when he saw it. As noted this notation is opposite and below the signature. The waiver is lengthy. It recites that the American State Bank has been closed and is in charge of the Superintendent of Banking and a receiver is about to be appointed unless some plan of re-organization is accomplished, that the undersigned are depositors, that it is the desire of the depositors and stockholders and others interested that same be re-organized and re-opened for business

and that in order to re-organize "and for the purpose of receiving for ourselves the benefits accruing and to accrue to us by reason of the contemplated opening of said re-organized bank * * * it is agreed by and between the depositors whose names are hereinbelow signed, and the contemplated re-organized bank, and the Superintendent of the Banking Department of the State of Iowa, and all others interested as creditors in the American State Bank of Walnut, Iowa, as follows:

"That the depositors whose names and amount of their deposits are signed hereto, by these presents and for the purpose of carrying out the plan of reorganization hereby agree to waive any and all claims that they may have against the American State Bank of Walnut, Iowa, its stockholders and directors to the extent of 55 per cent of the amount of their deposits as set opposite their names signed hereto.

"It is further understood and agreed that the organized bank shall assume the liability to the said depositors of the American State Bank to the remaining 45 per cent of the amount on deposit set opposite the names signed hereto according to the conditions and further agreements contained herein. That said depositors whose names are signed hereto will remain as said depositors of the said bank and keep their checking accounts at the said bank providing that they receive satisfactory and courteous treatment and that said bank may pay the said depositors in full for the remaining 45 per cent assumed by it on or before three years from the date hereof. * * *

"It is further stipulated and agreed that all money or moneys collected in any way from the assets of the American State Bank after paying the 45 per cent of the deposits to be assumed by the said reorganized bank and herein not waived, together with interest that the remainder so collected from the assets of the American State Bank, less any reasonable and necessary expense of such collection shall be applied to the payment of the 55 per cent of the deposits held by the signers hereto, on a pro rata basis. * * * That the depositors signing this agreement shall select from their number a board composed of three of the depositors to advise with and assist the officers of the reorganized bank in the collection of the assets of the said American State Bank so as to realize therefrom the largest amount for the depositors."

"It is further stipulated and agreed that this agreement shall not be of any force and effect unless approved by the Superintendent of the State of Iowa, and the reorganization accomplished in conformity herewith.

"Dated at Walnut, Iowa, this 26th day of June, 1923."

Hans, according to his contention, therefore signed this general waiver and agreement without any specification of deposit or interest or claim or any limitation upon its scope and effect. The waiver was in such form that Hans was to set out the amount of his deposits but he (as he claims) did not do so. By implication he left it to those who were to act upon it to insert such amounts. Hans did not limit his agreement or authority to any deposit or claim. On his contention with full knowledge and intention that the waiver signed by him was to be used in the reorganization, that it was to be accepted by the other depositors and all others interested as creditors and by the Superintendent of Banking and by the proposed reorganized bank he agreed "to waive any and all claims" that he had against the American State Bank to the extent of 55 per cent, that the reorganized bank should assume liability to depositors to the remaining 45 per cent, that the Superintendent of Banking and the American State Bank might transfer to the reorganized bank or to any creditor of the American State Bank any notes or property of the American State Bank as might be necessary for the purpose of effecting the reorganization. The matter of reorganization was submitted by the Superintendent of Banking to the Attorney-general. The waivers were examined by the representatives of the Superintendent of Banking and the assistant attorney-general. Among the waivers submitted was that signed by Hans as it appears in its present condition specifying the C.D. $1200 and the $10,000 insurance. When and by whom this notation was made does not further appear except that all the witnesses who testified other than Hans and Turner say that the notation in its present form was on it when they first saw it. The new corporation, the Attorney-general and the Banking Department relied on this waiver.

The Attorney-general drew an elaborate contract between the American State Bank and the new corporation—the defendant Walnut State Bank by which the assistant cashier of the American was authorized to endorse without recourse all of its

bills receivable to the Walnut State, to execute to the Walnut State an assignment of all bills receivable or other property pledged as collateral and all the interest of the American State Bank in re-discount paper, to execute general warranty deeds for its real estate, to transfer all other property, including cash, to the Walnut State. At this point the provisions of the agreement should be noted with respect to the claim that the Walnut State assumed the liabilities of the American State. The agreement provides:

"That the Walnut State Bank of Walnut, Iowa, shall and does hereby assume the payment of all the existing liabilities of the American State Bank of Walnut, Iowa, on account of demand deposits, savings deposits, and time deposits, to the extent of 45 per cent of the principal thereof, without interest as shown by the books of the American State Bank at the time said books are turned over to the Walnut State Bank * * * Provided further that said Walnut State Bank of Walnut, Iowa, assumes and agrees to pay on said 45 per cent of said deposits so assumed, to each depositor or his assignee, 5 per cent interest thereon, payable annually * * * Provided that each and every depositor, * * * shall execute and deliver to the said Walnut State Bank of Walnut, Iowa, a cancellation and waiver in substantially the following form, to wit: 'For value received, the undersigned, being the owner of a certain demand deposit, saving deposit and time deposit of the American State Bank of Walnut, Iowa, in the amount of $ ............ does hereby cancel, surrender, assign and set over to the Walnut State Bank of Walnut, Iowa, all my right, title and interest in and to said deposits, receiving from the said Walnut State Bank of Walnut, Iowa, in lieu thereof, a time certificate of the said Walnut State Bank in the amount of $ ............ being 45 per cent of my said deposit, payable in three years from the date hereof, with interest at the rate of 5 per cent per annum, payable annually, at the banking house of Walnut State Bank at Walnut, Iowa. The original evidence of the indebtedness of the American State Bank of Walnut, Iowa, so cancelled and waived is herewith and as a part hereof delivered to the Walnut State Bank of Walnut, Iowa, and by such institution duly cancelled of record. Provided, however, that said depositor shall have certain salvage rights as contained in the contract * * * Provided, further, that as to all public

deposits \* \* \* the Walnut State Bank shall pay such deposits in full in the ordinary course of business. \* \* \* A complete list of all the deposits assumed and the amount assumed on each is subjoined herewith as Exhibit G and is made a part hereof. 6. That the Walnut State Bank of Walnut, Iowa, shall and does hereby assume the payment of all outstanding and existing liabilities of the American State Bank of Walnut, Iowa, on account of rediscounts and bills payable \* \* \* A complete list of all re-discounts and bills payable as shown by the books of the American State Bank, and as assumed by the Walnut State Bank and in the amount so assumed, is subjoined hereto as Exhibit H \* \* \* There is now due from the American State Bank of Walnut, Iowa, to the Council Bluffs Savings Bank of Council Bluffs, Iowa, a principal obligation in the sum of $87,135.88 with interest. It is understood and agreed that the Council Bluffs Savings Bank shall credit on said principal obligation, the sum of $25,000 and as to the amount of such credit, shall waive all claims of every kind which it may have against either the American State Bank or the Walnut State Bank. As to the balance of said indebtedness, the Walnut State Bank shall execute and deliver to the Council Bluffs Savings Bank a limited guarantee of payment, all as shown by the collateral agreement subjoined hereto. \* \* \*''

Here follows the like stipulation as to the indebtedness of the American State Bank to the Iowa National Bank of $58,449.23, with interest, on which the Iowa National was required to credit $25,000 and make the like waiver. Following is a stipulation as to the indebtedness of the American State Bank to the War Finance Corporation $116,260.95, with interest, which provides that the War Finance Corporation agrees to accept $50,000 of the collateral paper held by it free from the endorsements of the American State, and that the balance of the debt should be forthwith paid in cash by the Walnut State Bank all as shown by collateral agreement attached. The agreement between the American State Bank and the Walnut State Bank further recited the indebtedness of the American State Bank to the Bankers Trust, the Iowa National, the Des Moines National and the Council Bluffs Savings Bank, commonly known as ''the pool,'' in the aggregate sum of $147,000 with interest, and provided that the pool should select from the bills receivable

held by it paper amounting to approximately $100,000, which should become its paper without liability of any kind on the part of either the American State or the Walnut State, they to be released as to such $100,000, and as to the balance the Walnut State was required to execute to the pool "a limited guarantee of payment all as shown by the collateral agreement subjoined * * *" As a part of the agreement the American State was required to transfer "certain other cash and assets in the total sum of $56,484.05. In consideration thereof, the Walnut State Bank agrees on its part that certain salvage rights as hereinafter enumerated shall inure for the benefit of the individuals from whom said cash and assets are received." It was required that to offset on the books of the Walnut State the liabilities assumed by it the board of directors should set up all cash turned over to the Walnut State. Also $47,700 cash paid to the Walnut State Bank by certain individuals named, "less the amount set off therefrom to equal the amount of deposits not waived except public deposits. * * * The balance necessary to offset said liabilities so assumed, after setting up said cash items so referred to, shall be made up by property, bills receivable and commercial paper equal in value to said balance." All remaining assets to be placed in a trust fund to be administered by the board of directors of the Walnut State as trustees who were required to open a trust account, which should "be credited with all of the assets and property placed in said trust at the book value thereof, if any, * * * Said trust account shall be charged with all losses," and expenses. The board of directors was given power within three years to charge off the "book value of any of the assets and property set up to offset the liabilities, assumed as provided in Sub-Division 15 hereof (the $47,700 paid by the individuals above mentioned) and to place said property and assets so charged off in the trust account and to take from the cash in said trust account or from the assets of the Walnut State Bank such property and assets so charged off." After three years the trust fund was to be liquidated by repaying the individuals above named the $47,700 according to the terms stipulated and the balance on the 55 per cent of deposits waived.

Exhibit G of the contract between the banks is arranged in columns, the first containing the names of the depositors, the second headed "45%", the third "Waived 55%," the fourth

"Public money", the fifth "Unwaived 55%," the sixth "Total." In these columns are "George Bohnk sale A/c" opposite which are, under the 45%, 953.90, under the unwaived 55%, 1,165.88, under total, 2,119.78. Opposite the name of H. F. Bohnk are correspondingly 540.00, 660.00, 1,200. Opposite the name "Otto Ronna, Admr. Bohnk Est. are entered 76, 89, 93.97, 170.86. In the list of depositors in this exhibit appears the following: "Part of Bohnk insurance Reserved for note and interest," opposite which under the head of 45% is 482.82, under the head of unwaived 55% 590.10. Then follows in the list of depositors "Balance of Geo. Bohnk Insurance Payable to Hans Bohnk", and under head of "45%", 4,017.19, under the head of "waived 55%", 4,909.89, under the head of "total", 10,000.00. The footing of the 45 per cent is $260,124.07, of the waived 55% is $307,505.36, of the public money, $35,176.72, of the unwaived 55%, 10,515.95, of the total, 613,322.10. The evidence is that the Walnut State Bank "figured we were deficient of good assets in" the amount of $47,700.

All parties concerned, including the Banking Department and the Attorney-general, took extraordinary pains to specify exactly and in detail all of the engagements undertaken by the Walnut State. In making the agreement they relied upon the Hans Bohnk waiver. Two waivers called for by the terms of the contract between the banks, one waiver having at the top a notation of Hans's $1200 deposit and 45 per cent being $450, and the other having at the top notation "Acct Hans F. Bohnk, Ins., amount $8,927.08, 45 per cent being $4,017.19", and at the bottom "New C.D. No. 4373," pencil notation "Please sign and return" were sent to Hans but he did not sign them. That he was fully informed and that he understood that he had waived 55 per cent and that the new bank was assuming only 45 per cent is plainly shown by the following. On September 23, 1923, Hans wrote a letter addressed to Walnut State Bank saying:

"As I understand that the new bank is about to open up, which I hope it will, theirfore I have taken the dessire to A corresponding with yous wether I will be able to draw any money at the end of every year or not, which would be about 40 dollars * * * So please let me hear of your rules and orders. Is Otto Ronna in Walnut at this writing or not, or does anybody no where he is at, as he is the administrator for my boy estate

which comes of the 24 of this month, I think. If there is anybody nows anything about it I would. like to hear from them and would be greatly oblige for the same. This is not all, he has got away with some of my property which belonged to me for which I never received anything for, nore heard of, so you can see, fine work I say, so let me heare from you by the earlies reply and oblige."

On September 28, 1923, the bank wrote Hans stating that:

"You will be paid the interest on your money on deposit here annually, on the same basis as the other depositors, and if you should want a little money as suggested in your letter, we will be glad to let you have it * * * Otto Ronna is not now in Walnut. Where he is we do not know. We have been told that Otto Ronna is coming back for the purpose of closing your son's estate, and if you will sign the papers which will probably be sent you by the attorney for the estate the estate can be closed up."

On November 1, 1923, the bank wrote Hans:

"Beg to acknowledge receipt of your letter of recent date wherein you make inquiry concerning the deposit which you have in this bank, and also regarding the estate of your son George. In regard to your own deposit, which was formerly $1200.00 in the defunct American State Bank, there is now a new Certificate of Deposit here for delivery to you drawn on the new bank in the amount of $540.00 or 45% of your original deposit * * * If you will sign the enclosed receipt marked personal account and return the same to us together with your old certificate of deposit we shall forward to you this new one * * *"

Then follows an account of the sale of the personal property showing a total of $1734.78 to be applied on the mortgage, leaving a deficit of $1072.92.

"Now your son had a life insurance policy which netted his estate $10,000.00 at his death which we had previously persuaded him to take. Knowing that the total value of his chattel property was not sufficient to pay the total amount which he owed the old bank, he assigned this insurance policy to them in an amount sufficient to secure whatever the balance of his

debt might be at any time should any misfortune befall him. Therefore, out of this $10,000.00 we deducted the balance of this debt, leaving the total amount of $8,927.08 due you as the heir of his estate. This amount was, of course, to your credit in the American State Bank, and covered under the waiver which you signed for your deposits therein. Now, the 45% of this amount, which is the part thereof that is assumed and guaranteed, has been placed in a Certificate of Deposit for $4017.19 issued by the new bank, drawing interest from September 26, 1923, at the rate of 5% per annum, according to the terms and conditions of the waiver contract. * * *'' Hans accepted this situation for five months later, on April 9, 1925, he wrote to an officer of the Walnut State:

"Dear Friend: I am in request to no from you whether or not I am able to draw the intress on the $4017.19 which was due last September, 1924, at any time I would call for it, but not at this writing, as I want to heare from you first and then that I may write you again and tell you what I want and what I want you to do, or that I may draw a part of it and leave the others just as I feel about it. How is Mr. Ronna getting along by this time? Suppose is feeling fine, sure takes the cake. Well, Angus, how or yous geting along in the bancing affairs in which I hope everything is coming out all right."

It will be seen that Hans was then accepting the relationship to the Walnut State Bank as having a C.D. for $4017.19 on which the first year's interest was due the preceding September. He was deferring his decision as to whether to draw a part and leave the rest.

■ By Section 11919, Code, 1927, "the avails of any life or accident insurance * * * are not subject to the debts of the deceased, except by special contract or arrangement, and shall be disposed of like other property left by the deceased." Hans Bohnk was the sole distributee of his son's estate. The only parties beneficially interested in the life insurance policy were therefore the bank and Hans F. Bohnk. While plaintiff was under the duty of making collection of the insurance his duty was to the bank of which he was president and to Bohnk for whom, as to the balance above the amount to which the bank was entitled, he was trustee. The plaintiff and the bank of

which he was president and those dealing with the bank treated the balance of the insurance fund as belonging to Hans F. Bohnk. Hans so regarded the balance in the hands of the American State Bank after the payment of the indebtedness to it as his property. The only right that the plaintiff has at any time had to the insurance money is the naked right to receive the balance after payment of the American State Bank and to pay it to Hans. The law looks beyond the nominal parties to the real parties in interest and determines the case according to the rights of the latter. See Foreman Shoe Co. v. F. M. Lewis & Co., 60 N. E. (Ill.) 971; 47 C. J. 29. Hans is the real party in interest. The suit is prosecuted for his benefit. He is barred from claiming more than the 45 per cent of the balance of the insurance money. He cannot through the empty formality of suing in the name of the administrator recover more.

█ Conceding that the balance of the insurance money that came into the hands of the American State Bank was received and appropriated wrongfully, and that a trust might have been impressed upon it if found in the hands of the American State Bank the fund had been used in the payment of the debt of the American State Bank to the Iowa National Bank. The fact that by the appropriation of the insurance money to the payment of the indebtedness of the American State to the Iowa National Bank the debts of the American State Bank were to that extent paid and its other assets released furnishes no foundation for a claim in behalf of plaintiff or Hans F. Bohnk that the assets of the American State Bank were thereby augmented. The money did not go into any of the promissory notes or other collateral held by the Iowa National Bank and no trust on account thereof can be impressed upon the assets of the American State Bank transferred to the hands of the Walnut State Bank. Leach v. Iowa State Savings Bank, 204 Iowa, 497. Besides the Walnut State Bank purchased the assets of the American State Bank in good faith, for value and without notice of any alleged trust.

Plaintiff contends that he "is entitled to recover on the basis of the trust doctrine under which the creditors of an insolvent corporation have a lien upon all of its assets, in the hands of a new corporation receiving the same not in the ordinary course of the insolvent corporation's business; that the new corporation receiving the same thereby assumes all the liabilities

of the insolvent corporation, even though the two corporations attempt to limit by written contract the liability of the new corporation to certain specified liabilities of the insolvent corporation." To sustain this proposition the plaintiff as we understand relies principally upon Luedecke v. Des Moines Cabinet Co., 140 Iowa 223. In that case this Court said:

"In order to render the purchasing company personally liable for the debts of the selling corporation, it must appear that (a) there be an agreement to assume such debts; (b) the circumstances surrounding the transaction must warrant a finding that there was a consolidation of the two corporations; or (c) that the purchasing corporation was a mere continuation of the selling corporation; or (d) that the transaction was fraudulent in fact."

We need not be detained with any discussion of that case. It manifestly does not support plaintiff's contention. As we understand plaintiff's further contention is that the Superintendent of Banking had no authority to proceed other than as receiver or to liquidate the affairs of the American State Bank and distribute its assets and therefore the contract between the two banks and the transfer of the assets from the old to the new were illegal. The State Superintendent of Banking had authority to liquidate the American State Bank. Leach v. Exchange State Bank, 200 Iowa 185. That is precisely what the Superintendent of Banking proceeded to do. In the process of liquidating the contract and transfer in question were made. All concerned proceeded in the utmost good faith and Hans had made himself a party to the arrangement without limitation or restriction. There was no illegality. There was no fraud.

Plaintiff also argues that he "is entitled to recover on the basis of the written contract entered into between the American State Bank and the Walnut State Bank, under which contract the Walnut State Bank received all of the assets of the American State Bank as shown on the books of the bank including the plaintiff's claim, and that the Walnut State Bank now has in its hands, cash or assets or money, the proceeds of assets, it received from the said American State Bank, out of which plaintiff is entitled to be paid."

By the written contract the Walnut State Bank agreed to

pay 45 per cent of the deposits in the American State Bank. The only basis for a claim that plaintiff or Hans F. Bohnk is on account of the insurance money a depositor is the fact that Hans has been treated and has accepted the relationship as such to the amount of the $4017.19 for which Hans has been offered a certificate of deposit in the Walnut State Bank. There is no provision of the contract by which plaintiff or Hans is entitled to recover more than the 45 per cent. German American St. Bank v. Farmers & Merchants Sav. Bank, 203 Iowa 276. As has been stated the Walnut State Bank has not received the proceeds of the insurance money. It did not agree to pay all the liabilities of the American State Bank. It may be added that the cause of action of plaintiff or Hans F. Bohnk against the American State Bank, aside from pursuing the insurance money and establishing it as a trust, was one for accounting or for conversion over which the depositors were entitled to preference. It is obvious, upon this record that if the American State Bank had been liquidated in the ordinary manner less than 45 per cent of the deposits would have been realized. Plaintiff and Hans F. Bohnk by the arrangement to which Hans has agreed have not only, on the assumption that they were entitled to the status of a depositor, realized more than they otherwise would but on any other assumption would have realized nothing.

It will be seen that Hans had waived a claim which he might have had against the defendants for conversion. He had waived a claim which he might have asserted to an accounting. If he had not waived them either cause of action would have been subject to preference to depositors. Bailey v. Clarinda Trust & Savings Bk., 200 Iowa 1147. There would have been no assets with which to have paid them. He had waived any claim to impress the balance of the insurance fund as a trust on the assets. If he had not waived it the fund had been dissipated. His claims were against the American State. He could obtain no claim under the contract between the American State and the Walnut State except so far as that contract was made for his benefit. It was made for his benefit to the extent of 45 per cent. This he knew of, accepted for more than five months when he inquired about his right to interest on the precise amount of the certificate which was held for him by the Walnut State—$4017.19.

Manifestly the Walnut State Bank was not agreeing to pay

undisclosed obligations of the American State or to pay any deposits in full except public deposits as to which they were then relying upon the Marathon case, and except specified unwaived deposits. The contract was carefully drawn to define exactly what the liabilities of the Walnut State Bank were to be. The Banking Department and the Attorney-general were looking after the interests of the new depositors in the Walnut State Bank and securing them. The persons interested in the two banks were carefully scrutinizing the contract, understood and intended that it should specify exactly what they were to assume and it did so specify. The Walnut State Bank did not assume, and would not by the public authorities be permitted to assume, unknown obligations.

The Walnut State Bank is not contesting the right of Hans to payment of the certificates of deposit which it has made out in his favor and this decree will be without prejudice to the rights of Hans, or his assignees, to payment of the same.—Reversed.

All Justices concur.